# IN THE UNITED STATES DISTRICT COURT
# FOR EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **STEVEN BELT and GRACE CASTRO,** individually and on behalf of all others similarly situated and the Putative Classes<br><br>Plaintiffs,<br><br>v.<br><br>**P.F. CHANG'S CHINA BISTRO, INC.**<br><br>Defendant. | Civil Action No.: 18-3831-AB |

## DECLARATION OF DANIEL S. BROME

I, Daniel S. Brome, hereby declare:

1. I am an attorney that represents Plaintiffs in the above-captioned matter. I make this Declaration in support of the Joint Motion to Preliminarily Approve Fair Labor Standards Act Settlement and to Voluntarily Dismiss State Law Claims.

2. The Named Plaintiffs and the Opt-in Plaintiffs in this case similarly allege that they worked for Defendant in tipped roles and were paid on the reduced tip credit rates, but performed similar and excessive side work such that they should have received minimum wages.

3. The Parties disputed many aspects of discovery, including: a) how many of the approximately 6,200 Plaintiffs should be required to participate in written discovery, b) how many Plaintiffs should be required to sit for depositions, c) the substance of Defendant's discovery requests, d) how to handle Plaintiffs who were selected for discovery but did not respond, and e)

1

whether Plaintiffs' discovery responses should precede any of Defendant's further discovery responses. The outcome of this process was that the Parties agreed that 12% of the Opt-in Plaintiffs—approximately 745 individuals—would respond to written discovery, consisting of up to 10 interrogatories, 10 requests for production of documents, and 10 requests for admission. Because some Plaintiffs did not respond, written discovery requests were ultimately issued to 1,228 Opt-in Plaintiffs, and a total of 778 individuals responded to one or more set of written requests, and 451 Opt-ins responded to all three sets. The Court authorized Defendant to depose 62 Opt-in Plaintiffs, and Plaintiffs to depose 62 supervisors. The Parties were in the process of scheduling these depositions when they agreed to attend mediation. In addition to the considerable evidence provided by Plaintiffs, Defendant produced detailed records of servers' work histories and compensation. Specifically, Defendant produced data pulled from its point of sale systems for 5,700 Opt-in Plaintiffs, which showed the times servers were assigned to a table and closed out a table. Plaintiffs' Counsel conducted detailed analysis of the point of sale data, which included 20 million time punches (such as clocking in or clocking out, or punching a table) to evaluate merits and damages issues.

4.  The Parties attended mediation with Hon. Diane Welsh (ret.) on December 13, 2023. Following the mediation, the Parties continued to negotiate the terms of the proposed settlement with the continued help of Judge Welsh and executed a terms sheet on March 6, 2014. The long form settlement agreement, which is the subject of this motion, was executed on May 6, 2024. A true and correct copy of the agreement is attached hereto as **Exhibit 1**.

5.  At the time of mediation, Plaintiffs' Counsel conducted detailed damages modeling based on analysis of Defendant's point-of-sale data, and supplemented with information obtained through the extensive Plaintiff discover process. On the high end, assuming <u>complete</u> success for

Plaintiffs – defeating decertification, proving liability, proving that Defendant's violation was willful, defeating Defendant's good faith defense to liquidated damages, and recovering wage differentials for 33% of the Opt-in Plaintiffs' work time, Plaintiffs' Counsel calculated Defendant's exposure at $■■■■■■■■. This best-case scenario would only occur if Plaintiffs were able to recover for <u>all</u> time spent performing side work, but the current regulations make this unlikely, since they provide that an employer "cannot take a tip credit for any time spent on directly supporting work <u>that exceeds the 20 percent tolerance</u>." 29 C.F.R. § 531.56(f)(4). Under a more plausible outcome, if Plaintiffs did not establish a willful violation, did not obtain liquidated damages, and only recovered damages based on 10% of their work time, Plaintiffs' Counsel calculated Defendant's exposure (unliquidated) at $■■■■■■■■. Of course, even that result assumes that Plaintiffs maintained collective status through trial and established liability, neither of which are foregone conclusions. Based on these possibilities, the $■■■■■■ settlement represents between ■% of the best possible recovery, and ■% of the realistic recovery.

      6.      To calculate each FLSA Opt-in Plaintiff's *pro-rata* settlement allocation, Plaintiffs' Counsel performed a detailed and comprehensive damages analysis. For each FLSA Opt-in Plaintiff, the analysis considered the hours worked for Defendant during the applicable statutory period and wages paid. The analysis then calculated the difference between the wage rate actually paid and the federal minimum wage. Finally, the analysis assumed that each FLSA Opt-in Plaintiff was able to recover that minimum wage differential for 30% of the time worked at sub-minimum wage rates. Based on this analysis, Plaintiffs' Counsel allocated individual *pro rata* Settlement Shares for each FLSA Opt-in Plaintiff. The amounts (after deductions for fees and costs) are expected to range ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ In conjunction with the settlement, Defendant has begun to supplement its data production, and is continuing to provide

additional data; Plaintiffs' Counsel will incorporate the supplemental data productions into the allocation prior to notice.

7. There has been very little media coverage of this case that I am aware of.

8. The Named Plaintiffs have demonstrated a commitment to the case by assisting with the preparation of the Complaints, executing declarations, and completing written discovery. They were prepared to sit for a deposition and available to assist with mediation and negotiations. They have maintained regular contact with Plaintiffs' Counsel and have been and remain committed to representing the class.

9. For over 30 years, Nichols Kaster has been dedicated to advocating for employee and consumer rights. As is reflected in the firm's resume (attached hereto as **Exhibit 2**), the majority of the firm's work is concentrated on representing employees in class action suits. Nichols Kaster has represented thousands of employees in hundreds of cases. The firm is currently lead or co-counsel in many class and collective actions in state and federal courts around the country. Nichols Kaster was named the Employment Rights Law Firm of The Year by ALM in 2020 and received a First Tier ranking on the 2021 Best Law Firms List in Minneapolis for Litigation-Labor and Employment by U.S. News-Best Lawyers "Best Law Firms." The firm has demonstrated record of success in wage and hour litigation. In fact, the firm has twice prevailed on behalf of employees at the United States Supreme Court in cases involving the FLSA. *See Kasten v. Saint-Gobain Performance Plastics Corp*., 563 U.S. 1 (2011) (the FLSA's prohibition on retaliation protects oral as well as written complaints); *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199 (2015) (rejecting industry group's challenge to a Department of Labor Administrator's Interpretation). We are currently lead or co-counsel in many class or collective actions in state and federal courts filed across the country.

10. Plaintiffs' Counsel exhausted considerable time and effort on this case, including: (1) taking a 30(b)(6) deposition; (2) requesting and reviewing written and electronic discovery, including voluminous point-of-sale data; (3) constructing damages models; (4) briefing and arguing numerous contested motions; and (5) collecting information and responding to discovery from hundreds of servers.

11. The primary attorneys litigating this matter have been myself and Reena Desai. Other attorneys also made significant contributions to this case.

12. Ms. Desai is a partner at Nichols Kaster. She received a B.A. from the George Washington University in 2002 and a J.D. from the University of Minnesota Law School in 2007. She was admitted to the bar of the State of Minnesota in 2007. Ms. Desai has worked at Nichols Kaster since 2009, and before joining Nichols Kaster, she practiced at a large law firm in Minneapolis working on complex litigation. As an attorney at Nichols Kaster, she has represented thousands of employees in dozens of class and collective actions for overtime pay, and has spoken at several national conferences on wage and hour issues. She has been named a Rising Star by Minnesota Super Lawyers every year since 2014. Ms. Desai also serves as an adjunct professor at the University of Minnesota Law School. Her time was billed at $575 per hour.

13. Together with Ms. Desai, I was the other attorney primarily litigating this case. I am a senior counsel at Nicholas Kaster's San Francisco office and focus on wage and hour class and collective cases. I was admitted to the California Bar in 2011 and have consistently represented workers since then. I have been named a Northern California Rising Star every year since 2016. My time was billed at $550 per hour.

14. Several staff members, including paralegals, clerks, and litigation support personnel also performed work integral to the success of the case. The hourly rate for these staff

5

members is $195.

15. Multiple damages analysts contributed to this work, billed at rates of $225 per hour except for Alexander Wise. Mr. Wise is our firm's data analytics manager; he has worked for my firm for over 15 years and has performed damages analyses in 300 cases. Mr. Wise's hourly rate is $275.

16. Multiplying the hours expended (▮▮▮▮ hours) by the reasonable hourly billing rates of Nichols Kaster's attorneys and staff yields a lodestar of $▮▮▮▮▮▮▮.

17. My firm has already incurred $▮▮▮▮▮ in costs to date. These costs include mediation fees, deposition transcript costs, travel costs, electronic research charges, case advertising costs, document retention database charges, process server charges, and filing fees. The largest single cost was paying an administrator for conditional certification notice.

18. My firm took this case on a contingency basis and advanced all costs. This case carried with it a significant possibility that Plaintiffs, and therefore my firm, would recover nothing. My firm has not received any reimbursement for its costs or payment for its time to date.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Date: May 16, 2024                                         s/ *Daniel S. Brome*
                                                            Daniel S. Brome